**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| **DARRELL STEVEN KING,** | ) |
| | ) |
| **Petitioner,** | ) |
| | ) |
| **v.** | )     **Case No. 14-CV-112-JED-TLW** |
| | ) |
| **TERRY ROYAL, Warden,[1]** | ) |
| | ) |
| **Respondent.** | ) |

## OPINION AND ORDER

Before the Court is the petition for writ of habeas corpus (Doc. 1), filed by Petitioner Darrell

Steven King, a state inmate appearing *pro se*.  Respondent filed a response to the petition (Doc. 11)

and provided the state court records (Docs. 11, 12) necessary for adjudication of Petitioner's claims.

Petitioner filed a reply to the response (Doc. 13).  For the reasons discussed below, the petition for

writ of habeas corpus shall be denied.

## *BACKGROUND*

In resolving Petitioner's claims raised on direct appeal, the Oklahoma Court of Criminal

Appeals (OCCA) provided a summary of facts.  *See* Doc. 11-3.  Petitioner fails to rebut the OCCA's

statement of facts with clear and convincing evidence and it is, therefore, presumed correct.  *See* 28

U.S.C. § 2254(e)(1).  Therefore, this Court adopts the following factual summary as its own:

---

[1]     Petitioner is in custody at the Oklahoma State Penitentiary, in McAlester, Oklahoma.
Pursuant to Rule 2(a), *Rules Governing Section 2254 Cases in the United States District Courts*, the
proper party respondent in this matter is Terry Royal, Warden.  Therefore, Terry Royal, Warden,
is substituted in place of Robert C. Patton, Director, as party respondent.  The Clerk of Court shall
note the substitution on the record.

On July 30, 2007, Appellant,[2] Jeremy Finch, and Von Christopher Butler shot and killed Mark "Capone" Williams in a drug house in Tulsa, Oklahoma. Appellant, Williams, Finch, Butler, and Lyndell Dabney were all members of the Neighborhood Crips gang. The shooting was intended to prevent Williams from testifying against Dabney.

On March 30, 2007, Dabney killed fellow gangmember Demonzo Washington. Homicide Detectives with the Tulsa Police Department determined that Williams was a witness to that offense. Dabney was arrested and charged with Washington's murder in CF-2007-3296, District Court of Tulsa County. Williams was made a material witness and released from jail on an ankle monitor.

Dabney's case was set for preliminary hearing on August 17, 2007. Word spread throughout the community that Williams was "snitching," i.e., going to testify against Dabney. Williams was listed on Dabney's "paperwork."

On July 24, 2007, Dabney's attorney received the State's discovery materials. He provided a copy of those materials to Dabney at the jail and gave a copy to Dabney's girlfriend, Cheryl Osborne. Williams' statement against Dabney was included in the paperwork. Despite this fact, Dabney assured his attorney that Williams would not testify against him, claiming that Williams was his friend.

At 11:41 a.m., on [July 30, 2007,] the day that Williams was killed, Dabney telephoned Osborne from the jail. Osborne informed Dabney that she had his "paperwork." Dabney indicated that he had already seen the reports. Dabney had Osborne make a three-way call to Appellant. This phone call was recorded by the jail's telecommunication system. Appellant and Dabney engaged in a vague conversation that was filled with gang slang.

Daniel Olson, a cryptanalyst with the Federal Bureau of Investigation, reviewed the recording and determined that Appellant's conversation with Dabney contained coded or veiled meaning codes within it. [Sergeant] Williams [sic] Van Ellis with the Tulsa Police Department's Criminal Intelligence Unit reviewed the message and provided context to the many gang words that the men used in the conversation.

During the conversation, Dabney directed and Appellant agreed to kill Williams to prevent Dabney's prosecution for murdering Washington. Dabney explained to Appellant that he was trying "to get this shit handled" but that he needed to "stop the train" or prevent the case from going forward. He complained

---

[2]     Throughout the state court direct appeal documents, Petitioner Darrell Steven King is referred to as "Appellant."

that "nobody else gonna stop the motherfuckers."  Appellant asked Dabney if he wanted him to "to stop this thing . . . to see cuz and shit," i.e., Williams.  Dabney complained that everything should have already been taken care of and Appellant responded that he was "fixin to go there."  Dabney was unimpressed and explained that it was "black and white" that Williams was "on hood," i.e., snitching against another gang member.  Appellant explained that he knew the business but blamed "the other dudes."  Dabney and Appellant discussed the whereabouts and current activities of fellow gang members Jeremy "G-Dub" Finch and Von "Moo Shoo" Christopher Butler.  Appellant related that he would "be hollering all those big guys and shit, you know."  Dabney reiterated that it was "serious business" and told Appellant to "make sure of it."  Appellant reiterated "Oh fuck, yeah."  Both men ended the call by loudly proclaiming phrases indicating their loyalty to each other.

Appellant, Finch, and Butler met up with Williams at Patricia Lumpkins' house that evening.  Lumpkins permitted drugs to be sold from the house in exchange for a small percentage of the drugs involved in the transaction.  Several individuals were in Lumpkins' home on this date.  Alvin Davis, Sandra Lee Dowell, Arthur Walker, and Lumpkins' niece, Shaletha Brown, were present.

Davis, Finch, Butler, and Williams played dominoes at the dining room table.  Williams wore an ankle monitor and a loud argument broke out about whether Williams was snitching.  All of the men calmed down and returned to playing dominoes.  Dowell left the home in due course.  Appellant kept asking Shaletha Brown to go to the store for him, but she was high on drugs and refused to leave.  Appellant found Patricia Lumpkins in the back bedroom and escorted her to the front door.

Williams sat at the dining room table playing dominoes with his back to the living room Appellant stood in the living room a few feet behind Williams.  Appellant shot Williams in the back of the head with his .45 caliber handgun.  Davis jumped up and asked Appellant what is going on?  Appellant responded that "he had to go" because "he was snitching."  Davis responded:  "is that what paperwork do to people?"  Arthur Walker tried to leave out the front door and Appellant ordered him back into the house.

Finch came around the table and shot Williams in the back with the 9 mm handgun.  Williams fell to the floor.  Butler got up, took Williams' .380 handgun, and shot Williams in the back as he lay on the floor.  Finch then went through Williams' pockets taking his cash and his drugs.  Everyone fled the home.

At 8:32 p.m., officers found Williams deceased, face down on the floor in Lumpkins' home.  He died from the three gunshot wounds.  The Medical Examiner retrieved all three projectiles from Williams' body.  One projectile was a .45 caliber lead core.  The other two projectiles were medium caliber projectiles similar to a 9

mm or .380 caliber.  Only a single .380 shell casing was discovered at the scene.
DNA samples from the cigarette butts found on the table matched DNA samples
from Appellant, Finch, Butler, Williams, and Davis.

Law enforcement officers found Finch and Appellant on August 1, 2007 at
an apartment located at 2218 South Jackson.  This apartment belonged to Finch's
girlfriend, Kenesha Midget.  Officers arrested Finch and Midget on outstanding
arrest warrants.  The officers conducted a protective sweep of the apartment and
observed two backpacks matching the description of the backpacks that Finch and
Appellant had been seen with on the day of Williams' death.  The officers applied
for and obtained a search warrant to search the apartment.  Officers recovered the
backpacks.  Inside the Jordan brand backpack, officers found cash, three handguns,
and the same type of drugs that Finch had taken from Williams.  Appellant's .45
caliber handgun was in the bag as well as the 9 mm he traded to Osborne.  The third
gun was a .380 caliber.

Appellant testified in his own defense.  Appellant admitted that he was
present in the home when Williams was shot but denied shooting Williams.  Instead,
Appellant testified that he got onto the ground when he heard the first shot and did
not see who shot Williams.  Appellant testified that previously he had been high up
in the gang but his gang activities had stopped in 2006.  He asserted that the phone
call between Dabney and him was about raising money for Dabney's attorney fees
and events that had happened in the community.  Under cross-examination,
Appellant admitted that he was a twice convicted felon.  Appellant confirmed the
State's interpretation of the majority of the gang slang Dabney and he used in the
recorded telephone call.  Appellant admitted that he wrote a letter to Finch from Jail
demanding to know why Finch had provided his name to law enforcement as being
involved in Williams' death.  The letter addressed gang morals and recited that
Appellant had spoken to the older homies about Finch.  Appellant related within the
letter that Finch should have kept his mouth shut.

*See* Doc. 11-3 at 1-6 (citations to record omitted).

Based on those events, Petitioner was charged in Tulsa County District Court, Case No. CF-

2007-4137, with First Degree Murder (Count 1); Possession of a Firearm After Former Conviction

of a Felony (Count 2); and Conspiracy to Commit First Degree Murder (Count 5).[3]  The record

---

[3]      Charged along with Petitioner were his co-defendants Butler, Dabney, Davis, and
Finch.  *See* Doc. 11-5 at 3.  Butler was convicted by a jury of First Degree Murder (Count 1) and
Possession of a Firearm After Former Conviction of a Felony (Count 3), and received sentences of
life imprisonment on Count 1 and two (2) years imprisonment on Count 3, to be served

reflects that, at the conclusion of trial, a jury convicted Petitioner of all three counts.  On February

11, 2011, the trial judge sentenced Petitioner, in accordance with the jury's recommendation, to life

imprisonment without the possibility of parole on Count 1, to life imprisonment on each of Counts

2 and 5, and ordered the sentences to be served consecutively.  *See* Doc. 12-10 at 8.  Petitioner

appeared *pro se* at trial with attorney David Phillips acting as stand-by counsel.  *See* Doc. 12-2, Tr.

Vol. II at 282.

Petitioner perfected a direct appeal to the OCCA (Doc. 11-1).  Represented by attorney

Stuart W. Southerland, Petitioner raised seven (7) propositions of error, as follows:

| | |
|---|---|
| Proposition 1: | The search of the apartment at 2218 South Jackson Ave., was conducted in violation of the Fourth Amendment to the United States Constitution as well as Article II, § 30 of the Oklahoma Constitution. Appellant requests that this case be remanded for a new trial where the fruits of the search – including the weapons claimed to have been used in the murder – must be excluded from evidence. |
| | a)   Appellant had standing to contest the legality of the search. |
| | b)   The search warrant affidavit failed to provide probable cause to search the apartment. |
| Proposition 2: | It was reversible error for the court to fail to honor Appellant's request for transcripts of witness testimony which pertained to this case.  The denial of transcripts at government expense prior to trial was a denial of Appellant's rights to equal protection and due process under the Fourteenth Amendment to the United States Constitution. |

---

consecutively.  Dabney was convicted on his plea of nolo contendere of Conspiracy to Commit Murder (Count 5) and received a sentence of thirty (30) years imprisonment, to be served concurrently with sentences entered in Tulsa County District Court, Case Nos. CF-03-1762, CF-06-2934, CF-07-3296, and CF-09-3351.  Finch was convicted by a jury of First Degree Murder (Count 1) and Possession of a Firearm After Former Conviction of a Felony (Count 7) and received sentences of life imprisonment on Count 1 and ten (10) years imprisonment on Count 7, to be served consecutively. All charges against Davis, including Accessory After the Fact (Count 4), Possession of a Firearm After Former Conviction of a Felony (Count 6), and Larceny from a Person at Night Time (Count 8), were dismissed.

Proposition 3:      The jail phone call recording contained inadmissible co-conspirator hearsay which violated Oklahoma statutory law as well as the Confrontation Clause of the United States Constitution.
a)      The statements were inadmissible hearsay.
b)      The statements were admitted in violation of the Confrontation Clause.

Proposition 4:      It was reversible error to refuse Appellant's proposed expert testimony relating to gang slang or code. The erroneous decision denied Appellant the right to due process and a fair trial pursuant to the Fourteenth Amendment to the United States Constitution as well as Article II, §§ 7, 20 of the Oklahoma Constitution and other relevant provisions of Oklahoma law.

Proposition 5:      Appellant's jury trial was unreasonably delayed in violation of both Oklahoma statutory law, Article II, § 20 of the Oklahoma Constitution, and the Fourteenth Amendment to the United States Constitution.
a)      The amended Informations.
b)      Speedy trial.

Proposition 6:      Appellant received ineffective assistance of counsel in violation of the Sixth Amendment to the United States Constitution.

Proposition 7:      The accumulation of error in this case deprived Appellant of due process of law and a fair trial under the Fourteenth Amendment to the United States Constitution.

*Id.* In an unpublished opinion, entered February 28, 2013, in Case No. F-2011-127, the OCCA affirmed the trial court's Judgments and Sentences (Doc. 11-3).

On March 12, 2014, Petitioner filed his *pro se* federal petition for writ of habeas corpus (Doc. 1). Petitioner identifies three (3) grounds of error, as follows:

Ground 1:      Conviction obtained by use of evidence obtained pursuant to an unlawful search and seizure in direct violation of the 4th and 14th Amendment[s] of the U.S. Constitution.

Ground 2:      Denial of compulsory process to obtain expert witness favorable to the defendant in direct violation of Due Process and Equal Protection of 14th Amendment of U.S. Constitution.

6

Ground 3:        Denial of transcripts to effectively defend and cross-examine adverse witnesses was in direct violation of due process and equal protection of the 14th Amendment of U.S. Constitution.

*Id.* In response to the petition, Respondent argues that Petitioner is not entitled to habeas corpus relief (Doc. 11).

## *ANALYSIS*

### A.    **Exhaustion/Evidentiary Hearing**

Respondent concedes, *see* Doc. 11 at 2, ¶ 5, and the Court agrees, that Petitioner fairly presented the substance of his claims to the OCCA on direct appeal. Therefore, the Court finds that Petitioner exhausted state remedies for his claims as required by 28 U.S.C. § 2254(b).

In addition, the Court finds that Petitioner is not entitled to an evidentiary hearing. *See Cullen v. Pinholster*, 563 U.S. 170, 184-85 (2011); *Williams v. Taylor*, 529 U.S. 420 (2000).

### B.    **Claims Presented in Petition for Writ of Habeas Corpus**

The Antiterrorism and Effective Death Penalty Act (AEDPA) provides the standard to be applied by federal courts reviewing constitutional claims brought by prisoners challenging state convictions. Under the AEDPA, when a state court has adjudicated a claim, a petitioner may obtain federal habeas relief only if the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *See* 28 U.S.C. § 2254(d); *Harrington v. Richter*, 562 U.S. 86, 102-03 (2011); *Williams v. Taylor*, 529 U.S. 362, 386 (2000); *Neill v. Gibson*, 278 F.3d 1044, 1050-51 (10th Cir. 2001). "Clearly established Federal law for purposes of § 2254(d)(1) includes

7

only the holdings, as opposed to the dicta, of [the Supreme Court's] decisions." *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014) (citations omitted).

When a state court applies the correct federal law to deny relief, a federal habeas court may consider only whether the state court applied the federal law in an objectively reasonable manner. *See Bell v. Cone*, 535 U.S. 685, 699 (2002); *Hooper v. Mullin*, 314 F.3d 1162, 1169 (10th Cir. 2002). An unreasonable application by the state courts is "not merely wrong; even 'clear error' will not suffice." *White*, 134 S. Ct. at 1702 (citation omitted). The petitioner "must show that the state court's ruling . . . was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.* (citation and internal quotation marks omitted); *see Metrish v. Lancaster*, 133 S. Ct. 1781, 1787 (2013).

Generally, a federal habeas court has no authority to review a state court's interpretation or application of its own state laws. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) (emphasizing that it is not the province of a federal habeas court to reexamine state court determinations on state law questions). When conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States. *Id.* at 68 (citations omitted). Further, the "determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

In this case, the OCCA adjudicated Petitioner's claims on direct appeal. *See* Doc. 11-3. Therefore,  the § 2254(d) standard applies to this Court's analysis of Petitioner's claims.

1.      **Fourth Amendment violation (Ground 1)**

In Ground 1, Petitioner argues that evidence against him found the day after the murder in the apartment located at 2218 South Jackson Avenue was obtained in violation of the 4th and 14th Amendments and should have been excluded by the trial court.  *See* Doc. 1 at 5.   Specifically, Petitioner alleges that Tulsa Police officers entered the apartment without a warrant and without consent of the occupants.  *Id.*  Police handcuffed Petitioner and transported him to the police station where he declined to be interviewed.  *Id.* at 6.  Subsequently, the police obtained a warrant for the apartment and recovered evidence linking Petitioner to the murder of Williams.  *Id.*  In rejecting Petitioner's claim on direct appeal, the OCCA found the trial court did not abuse its discretion in denying Petitioner's motion to suppress.  *See* Doc. 11-3 at 7-10.

In *Stone v. Powell*, 428 U.S. 465, 482 (1976), the Supreme Court held that, where the state has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search and seizure was introduced at trial.  The Tenth Circuit has reiterated that a federal habeas corpus court may not overturn a state criminal conviction because of a violation of the Fourth Amendment if the petitioner had a full and fair opportunity to litigate the claim.  *Brown v. Sirmons*, 515 F.3d 1072, 1082 (10th Cir. 2008);  *Miranda v. Cooper*, 967 F.2d 392, 401 (10th Cir. 1992); *Gamble v. Oklahoma*, 583 F.2d 1161, 1165 (10th Cir. 1978).  The opportunity for full and fair consideration detailed in *Stone* "includes, but is not limited to[,] the procedural opportunity to raise or otherwise present a Fourth Amendment claim[ ] and the full and fair evidentiary hearing contemplated by *Townsend v. Sain*, 372 U.S. 293 (1963)."  *Cannon v. Gibson*, 259 F.3d 1253, 1261 (10th Cir. 2001) (citation omitted).

9

The Court concludes that the state courts granted Petitioner a full and fair opportunity to litigate his Fourth Amendment claims.  On December 28, 2007, Petitioner filed a motion to quash search warrant and suppress subsequent search.  *See* Doc. 11-5 at 17.  On January 30, 2008, Tulsa County District Judge Jesse Harris held a hearing on the motion and ruled that "the fruits of the search warrant will be coming into evidence, if we go to trial."  *See* Doc. 12-1 at 15.  On April 18, 2008, Judge Harris again denied Petitioner's motion to suppress evidence.  *See* Doc. 11-5 at 20.  As noted above, the OCCA considered and rejected Petitioner's Fourth Amendment claim on direct appeal.  Doc. 11-3 at 7-10.

Because the record cited above demonstrates that the state courts provided an opportunity for full and fair litigation of Petitioner's Fourth Amendment claim, this Court is precluded from considering the issues raised in Ground 1.  *See Stone*, 428 U.S. at 494; *see also Gamble*, 583 F.2d at 1165 (opportunity for full and fair litigation in state court under *Stone* includes opportunity to raise Fourth Amendment claim, full and fair evidentiary hearing, and recognition and application of correct Fourth Amendment standards).  Therefore, habeas relief is denied as to Ground 1.

## 2.    Exclusion of expert testimony (Ground 2)

In Ground 2, Petitioner alleges that the trial court's decision to exclude the expert testimony of defense witness Dr. Art Williams violated his right to compulsory process and deprived him of due process and equal protection.  *See* Doc. 1 at 9-12.  At trial, the prosecution presented expert witness Tulsa Police Officer William Van Ellis to decode the gang jargon used by Petitioner and Dabney in a telephone conversation recorded at the Tulsa County Jail.  The testimony provided evidence to support the charge of Conspiracy to Commit First Degree Murder.  Petitioner argues that the testimony of Dr. Williams was crucial because it challenged the prosecution's conspiracy

10

allegation. *Id.* at 10.   On direct appeal, Petitioner argued that Dr. Williams should have been permitted to give his opinion as to the language Appellant and Dabney employed during the audiotaped telephone conversation. *See* Doc. 11-1 at 31-38.  The OCCA relied on Okla. Stat. tit. 12, § 2702, and ruled as follows:

> The trial court held an in camera hearing to determine whether Dr. Williams' proposed testimony could aid and assist the jury.  The trial court found that Dr. Williams was well qualified to assist in understanding the sociological issues of gang culture, the deep background and motivations behind gang affiliation, and the factors which lead young men into criminal activity including behavioral issues.  However, the trial court determined that Dr. Williams was not qualified in interpreting the specific conversations that the State intended to introduce into evidence and that the jury would not be assisted by Dr. Williams' area of expertise in the present case.

> Reviewing the record, we find that the trial court's determination is not clearly against the logic and effect of the facts presented.  The record reveals that Dr. Williams' area of specialized knowledge centered upon intervention and social behavioral issues.  Dr. Williams held a Ph.D. in human services and a Master's degree in psychiatric social work.  He was employed as a professor at Langston University and was the coordinator of the sociology, criminal justice, and criminology departments. Dr. Williams was a licensed drug and alcohol counselor, a certified mitigation specialist, a certified clinical criminal justice specialist, and was employed by the Oklahoma Indigent Defense System as an expert witness.  He had worked closely with gang members for over 20 years and had testified as an expert regarding gang and drug cultures. However, Dr. Williams explained that his expertise concerning gangs primarily involved: "Intervention behavior, family systems, background in terms of why young men join a gang," and "social behavioral issues."

> The record further reveals that Dr. Williams was not qualified by knowledge, skill, experience, training or education to interpret Dabney's and Appellant's recorded telephone conversation.  Dr. Williams candidly admitted that he did not have any training or experience in cryptanalysis, veiled-meaning codes or the critical analysis of messages.  Further, he did not have any experience in listening to or interpreting intercepted communications.   Although Dr. Williams had some familiarity with gang vernacular, he admitted that his experience was limited.  When he met with gang members he required them to speak proper English.  When he encountered words or symbols he did not recognize he asked his teenagers to interpret them.  Dr. Williams further related that he had never been called on to decipher or explain gang vernacular or messages.

11

Finally, the record reveals that Dr. Williams was unable to provide any additional insight into the recorded telephone conversation. Dr. Williams had reviewed both the audiotape and transcript of the conversation as well as the opinion of the State's expert. He related that it was his opinion that there was no explicit message to do harm to somebody in the conversation. He labeled the dialogue "jibber jabber stuff" but admitted that the conversation was not about nothing and that some of the words could have had an implicit meaning. He further related that the implicit meaning of the dialogue "could mean anything" and was "open to interpretation." Based upon the information known to him, Dr. Williams was unable to form an opinion as to the meaning of the phone call. He offered in the alternative that he could assist the jury in understanding the "background and reasons and rationales for gangs."

As Dr. Williams was unable to interpret the implicit meaning of the dialogue and Appellant's trial did not involve gang intervention, social behavioral issues, or the background and reasons for gangs, we find that the trial court did not abuse its discretion in determining that Dr. Williams' specialized knowledge would not assist the jury to understand the evidence or determine a fact in issue.

Appellant contends that Dr. Williams' opinion was just as valid as Sergeant Van Ellis' opinion and that Dr. Williams' opinion should have been admitted because the trial court admitted Van Ellis' opinion. However, that is not the test used to determine the admissibility of expert opinion. We do not compare the opinions of the proposed witnesses and determine their relative weight to one another. Instead, we are bound by § 2702 to determine whether the witness is qualified as an expert by knowledge, skill, experience, training or education. *Lott*, 2004 OK CR 27, ¶ 96, 98 P.3d 318, 344. Because Dr. Williams did not possess the knowledge, skill, experience, training or education to interpret the implicit message within the audiotaped telephone call, he was not qualified to render an expert opinion on this subject.

Doc. 11-3 at 19-22 (footnote and citations to record omitted). The OCCA also rejected Petitioner's claim that the trial court's exclusion of Dr. Williams' testimony after the start of trial resulted in the denial of necessary expert assistance under *Ake v. Oklahoma*, 470 U.S. 68 (1985) and *Rogers v. State*, 890 P.2d 959, 967 (Okla. Crim. App. 1995). *Id.* at 23-24. Reviewing for plain error, the OCCA determined that because "Appellant confirmed the meaning of the great majority of the words that Van Ellis translated from gang slang into English we are unable to find that an expert was

necessary to assist Appellant's defense.  We find that Appellant has not proven the existence of an actual error and thus plain error did not occur." *Id.* at 24.

To the extent Petitioner challenges the OCCA's application of state law governing admission of expert testimony, *see* Okla. Stat. tit. 12, § 2702, Petitioner is not entitled to habeas corpus relief. A federal habeas court has no authority to review a state court's interpretation or application of its own state laws. *See Estelle*, 502 U.S. at 67–68.  Habeas relief is not available for a challenge to state court evidentiary rulings unless the rulings "rendered the trial so fundamentally unfair that a denial of constitutional rights results." *Duckett v. Mullin*, 306 F.3d 982, 999 (10th Cir. 2002) (internal quotation marks and citation omitted).  A proceeding is fundamentally unfair under the Due Process Clause if it is "shocking to the universal sense of justice." *U.S. v. Russell*, 411 U.S. 423, 432 (1973) (internal quotation marks and citation omitted).

 The Court recognizes that "the Sixth Amendment right to compulsory process guarantees a defendant 'compulsory process for obtaining *witnesses in his favor*.'" *U.S. v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982) (quoting U.S. Const., Amend. VI (emphasis in original)).  However, to establish a violation of his compulsory process rights, a habeas petitioner must show his trial was rendered fundamentally unfair through the deprivation of material witness testimony. *Id.* at 872.

After reviewing the record, the Court cannot find that the OCCA's adjudication of Petitioner's federal constitutional claim was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.  28 U.S.C. § 2254(d).  As recounted by the OCCA, the trial judge held a hearing to determine whether Dr. Art Williams was qualified to aid and assist the jury in interpreting

the allegedly gang-coded telephone conversation between Lyndell Dabney and Petitioner. At that hearing, Dr. Williams testified that the focus of his gang experience was intervention behavior, family systems and social behavior issues. *See* Doc. 12-4, Tr. Vol. IV at 691. While he had worked with many members of the Neighborhood Crips gang, he never had to decipher their messages. *Id.* at 692. Dr. Williams further explained that when he spoke with gang members, he expected them to speak "English" and that if he did not understand them, he would ask his own teenage children to interpret. *See* Doc. 12-6, Tr. Vol. VI at 956. That testimony supports the trial court's ruling that Dr. Williams' area of expertise would not assist the jury in interpreting the specific telephone conversation between Petitioner and Dabney. *Id.* at 970.

Petitioner also claims that he was unfairly surprised by the State's belated challenge to Dr. Williams' qualifications. Although Petitioner claims in his petition (Doc. 1 at 11) that the State did not challenge Dr. Williams' qualifications until after resting on January 28, 2011, the record reflects that the hearing began on January 24, 2011, *see* Doc. 12-4, Tr. Vol. IV at 669, and concluded with the trial judge's decision to exclude Dr. Williams' as an expert witness on January 26, 2011, *see* Doc. 12-6, Tr. Vol. VI at 970-73. Furthermore, the trial judge's ruling excluding Dr. Williams' testimony preceded the testimony of the State's expert witnesses, FBI Agent Dan Olson and Sgt. William Van Ellis of the Tulsa Police Department. As a result, Petitioner's was able to tailor his cross-examination of the State's experts to elicit information confirming the vagueness of the telephone conversation. Also, Petitioner testified in his own defense and either confirmed or gave alternate meanings of slang words used in the telephone conversation. *See* Doc. 12-9, Tr. Vol. IX at 1505, 1543-48. Petitioner is not entitled to relief on his claim that the exclusion of Dr. Williams' testimony during trial resulted in unfair surprise.

14

For the reasons discussed above, this Court does not find that Petitioner's trial was rendered fundamentally unfair as a result of the trial judge's ruling excluding the testimony of Dr. Williams. Therefore, under 28 U.S.C. § 2254(d), Petitioner's request for habeas relief is denied as to Ground 2.

### 3.    Denial of transcripts (Ground 3)

As his third proposition of error, Petitioner alleges that his rights to due process and equal protection were violated by the trial judge's denial of his requests for transcripts of witness testimony presented during both the trial of his co-defendant, Jeremy Finch, and his own first trial which ended in a mistrial.  *See* Doc. 1 at 13-14.  Petitioner explains that:

> the transcripts in question pertained to witnesses who made several contrary statements as well as sworn testimony.  This impeachment evidence was material to Petitioner's defense and the jury should have been afforded the opportunity to weigh that evidence in order to make a fair decision.  On its face, a portion of this sworn testimony was outright known perjury.  In the least, it was impeachment evidence.

*Id.* at 14.  The OCCA denied relief on this claim, finding as follows:

> we find that Appellant's right to the basic tool of an adequate defense under *Britt* [*v. North Carolina*, 404 U.S. 226, 227 (1971)] was not violated.  Although the trial court determined that Appellant was indigent, under the circumstance of the present case the transcripts that Appellant sought were not available for a price to non-indigent defendants.
>
> A transcript of a prior proceeding is only available to a non-indigent defendant at trial if it is timely requested before the trial.  *See Kirk v. State*, 1976 OK CR 245, ¶¶ 3-5, 555 P.2d 85, 86 (distinguishing indigent's right to transcript under equal protection of the law from instance of non-indigent failing to use due diligence to acquire transcript); *Wright v. State*, 1973 OK CR 9, ¶ 16, 505 P.2d 507, 511 ("Where due diligence is shown in an effort to acquire same and a showing as to its need is made, it is then prejudicial error to force a defendant to trial without a preliminary hearing transcript . . . .").  This same rule applies to an indigent defendant.  *See Wilson v. State*, 1985 OK CR 67, ¶ 3, 701 P.2d 1040, 1041; *See also Griffin v. Illinois*, 351 U.S. 12, 16, 76 S. Ct. 585, 589, 100 L. Ed. 891 (1956) (finding no contention that petitioners were dilatory while recognizing right to free transcript under the Equal Protection Clause).  "The question[] would thus arise, did the

15

defendant show due diligence in acquiring the transcript . . . ." *Raper v. State*, 1977 OK CR 51, ¶ 13, 560 P.2d 978, 981.

Reviewing the record in the present case, we find that Appellant has not shown due diligence in seeking a free copy of the transcript of his co-defendant's trial. The co-defendant's trial was held one month before Appellant's original trial. Appellant filed a motion requesting a copy of the transcript of that trial twelve (12) days prior to his trial. Appellant presented the motion to the trial court one day before trial. The trial court denied this request and Appellant proceeded to trial without requesting a continuance. In *Raper*, this Court found that the "defendant's failure to timely request the transcript [of the preliminary hearing] until thirteen days prior to trial does not constitute due diligence." *Raper*, 1977 OK CR 51, ¶ 13, 560 P.2d at 981. As Appellant requested the transcript of the co-defendant's trial less than 13 days before trial, we find that Appellant's request was not timely.

. . . When the co-defendant filed his notice of intent to appeal, the trial court determined that he was indigent and directed the preparation of a transcript of his trial at the State's expense. When Appellant's case next came on for trial, the court reporter had not been able to complete the transcript of the co-defendant's trial. Under these facts, we find that a transcript of the co-defendant's trial was not available. As Appellant was in no different a position than a non-indigent appellant, we find that no error occurred.

Turning to Appellant's request for a transcript of his mistrial, we further find that Appellant has not shown due diligence in seeking a free transcript of the mistrial. On October 19, 2010, the trial court declared a mistrial and set Appellant's case for trial on January 18, 2011. Appellant waited until December 13, 2010 to file his motion asking for a copy of the transcript of the mistrial. Within this same motion, he again requested a copy of the transcript of the co-defendant's trial. However, Appellant did not obtain a ruling on either request and proceeded to trial.

. . . .

It was not until the third day of the trial that Appellant brought his request for a transcript of the mistrial to the attention of the trial court. The trial judge determined that a transcript of the mistrial had not been created. The judge took Appellant's motion under advisement and advised Appellant that if he could get the transcript created he would provide it to both parties. Appellant did not seek a continuance following the Court's ruling but, instead, announced ready for trial and proceeded to participate in the selection of the two alternate jurors.

After the fourth day of trial, the trial court recessed for the weekend. On the fifth day of trial, Appellant received a copy of the mistrial testimony of Shaletha Brown and William Van Ellis. Thereafter, Appellant reiterated his desire for a

16

transcript of the mistrial on several occasions. The trial court repeatedly informed Appellant that a transcript had not been created and it was simply a matter of whether the court could obtain a copy of the transcript under the time constraints of the trial.

On the afternoon of the seventh day of the trial, the trial court provided Appellant with the testimony of 13 of the State's witnesses from the mistrial. Appellant never received a complete copy of the mistrial transcript during trial. Instead, he received the testimony of 15 of the State's 25 witnesses. Although Appellant received this after the majority of the State's witnesses had testified, the trial court permitted Appellant to show cause why any of the State's witnesses should be recalled as a witness. Appellant did not seek to reexamine any of the State's witnesses concerning their previous testimony.

Under this set of facts, we find that Appellant's request for transcripts was untimely and does not show due diligence. We further find that those portions of the transcript which were never provided to Appellant as well as those portions of the transcript which were provided to Appellant after the witnesses' testimony were simply unavailable in light of Appellant's untimely request. As Appellant was in no different a position than a non-indigent appellant, we find that no error occurred. This proposition is denied.

*See* Doc. 11-3 at 11-15 (footnotes and citations to record omitted).

An indigent defendant may not be deprived of the tools necessary to prepare a defense. Such a defendant has a constitutional right to a free transcript of prior proceedings if it is reasonably necessary to present an effective defense at a subsequent proceeding. *U.S. v. Pulido*, 879 F.2d 1255, 1256 (5th Cir. 1989); *see also Britt v. North Carolina*, 404 U.S. 226 (1971); *Roberts v. LaVallee*, 389 U.S. 40 (1967). However, the mere request for a transcript by a defendant does not impose a constitutional duty on the trial court to order it prepared. *Matthews v. Price*, 83 F.3d 328, 334 (10th Cir. 1996). In *Britt*, the Supreme Court identified two factors relevant in determining whether an indigent defendant is constitutionally entitled, as a matter of equal protection, to the provision of a transcript at state expense: (1) the value of the transcript to the appeal or trial for which it is sought, and (2) the availability of alternative devices that would fulfill the same functions as a transcript. *Britt*, 404 U.S. at 227. Although it can generally be assumed in the case of a prior mistrial that a

transcript will be valuable both as a discovery device and as a tool for the impeachment of prosecution witnesses, there is no presumption that such is the case. *Id.* at 226. However, need can be assumed, especially "as a tool for the trial itself for the impeachment of prosecution witnesses." *Id.* at 228. Federal courts have refused to establish a *per se* rule that the government must provide a transcript following a mistrial in the absence of a showing as set forth in *Britt*. *See,* e.g., U.S. *v. Vandivere*, 579 F.2d 1240 (10th Cir. 1978); *U.S. v. Jonas*, 540 F.2d 566 (7th Cir. 1976).

Upon review of the record, and in light of the OCCA's detailed findings of fact, as quoted above, the Court does not find that the OCCA's adjudication of Petitioner's federal constitutional claim was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court, or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d). First, Petitioner fails to provide clear and convincing evidence to rebut the OCCA's factual findings. As a result, those factual findings are presumed correct. 28 U.S.C. § 2254(e)(1). The factual record cited by the OCCA demonstrates that the transcripts requested by Petitioner, including both the transcript of his co-defendant's trial and the transcript of Petitioner's mistrial, had not been prepared at the time of the request. As a result, any failure to provide or any delay in providing the requested transcripts was not a result of Petitioner's indigence, but a result of Petitioner's belated requests. Because the transcripts would not have been immediately available to a non-indigent litigant, there was no equal protection violation. Furthermore, the trial judge afforded Petitioner the opportunity, after Petitioner had been provided transcripts for 15 of the State's 25 witnesses, to show cause why any of the State's witnesses should be recalled. Petitioner chose not to take advantage of the opportunity. Petitioner has not demonstrate that his trial was

18

rendered fundamentally unfair as a result of his inability to acquire the requested transcripts prior to the testimony of the State's witnesses.  Petitioner has failed to demonstrate entitlement to habeas corpus relief under 28 U.S.C. § 2254(d).  Habeas corpus relief on Ground 3 is denied.

**C.**      **Certificate of Appealability**

Rule 11, *Rules Governing Section 2254 Cases in the United States District Courts*, instructs that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  The Court may issue a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," and the Court "indicate[s] which specific issue or issues satisfy [that] showing."  28 U.S.C. § 2253.  A petitioner can satisfy the standard by demonstrating that the issues raised are debatable among jurists, that a court could resolve the issues differently, or that the questions deserve further proceedings.  *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000) (citation omitted).

After considering the record in this case, the Court concludes that a certificate of appealability should not issue.  Nothing suggests that the Tenth Circuit would find that this Court's application of AEDPA standards to the OCCA's decision was debatable amongst jurists of reason. *See Dockins v. Hines*, 374 F.3d 935, 937-38 (10th Cir. 2004).  The record is devoid of any authority suggesting that the Tenth Circuit Court of Appeals would resolve the issues in this case differently. A certificate of appealability shall be denied.

*CONCLUSION*

After careful review of the record, the Court concludes Petitioner has not established that he is in custody in violation of the Constitution or laws of the United States. Therefore, the petition for writ of habeas corpus shall be denied.

**ACCORDINGLY, IT IS HEREBY ORDERED** that,

1.    The Clerk of Court shall note the substitution of Terry Royal, Warden, in place of Robert C. Patton, Director, as party respondent.

2.    The petition for a writ of habeas corpus (Doc. 1) is **denied**.

3.    A certificate of appealability is **denied**.

4.    A separate judgment shall be entered in this matter.

ORDERED THIS 6th day of February, 2017.

JOHN E. DOWDELL
UNITED STATES DISTRICT JUDGE